**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

| | |
|---|---|
| STUDENTS FOR LIFE AT MIAMI UNIVERSITY OF OHIO, HAMILTON, ELLEN WITTMAN, MARGARET BRUNS, MORGAN SMITH, and CHLOE OLBERDING, *Plaintiffs,* *v.* THE TRUSTEES OF MIAMI UNIVERSITY OF OHIO—Mark E. Ridenour, Robert W. Shroder, Dennis A. Lieberman, Jagdish K. Bhati, David H. Budig, Thomas W. Gunlock, John C. Pascoe, Sandra D. Collins, Rod Robinson, Robert E. Coletti, Diane F. Perlmutter, C. Michael Gooden, John Altman, Terry Hershey, Alexandra N. Boster, Hallie G. Jankura—in their official and individual capacities; GREGORY P. CRAWFORD, President of Miami University of Ohio, in his official and individual capacities; CATHY BISHOP-CLARK, Interim Associate Provost and Dean of Miami University of Ohio, Hamilton, in her official and individual capacities; PETER HAVERKOS, Senior Assistant Dean for Student and Academic Success at Miami University of Ohio, Hamilton, in his official and individual capacities; MARY BAUSANO, Assistant Dean for Student Success at Miami University of Ohio, Hamilton, in her official and individual capacities; and CAITLIN BORGES, Director of Student Activities and Orientation at Miami University of Ohio, Hamilton, in her official and individual capacities, *Defendants.* | Case No. _____ **JURY TRIAL DEMANDED** |

**PLAINTIFFS' VERIFIED COMPLAINT**

Plaintiffs Students for Life at Miami University of Ohio, Hamilton ("Students for Life at MUOH"), Ellen Wittman, Margaret Bruns, Morgan Smith, and Chloe Olberding, by and through counsel, and for their Verified Complaint against Defendants,

1

hereby state as follows:

## INTRODUCTION

1.    The cornerstone of higher education is the ability of students to participate in the "marketplace of ideas" on campus. That marketplace depends on free and vigorous debate and expression between students—debate and expression that is spontaneous, ubiquitous, and often anonymous—and is often carried out through spoken words, flyers, signs, and displays.

2.    By policy and practice, Miami University of Ohio, Hamilton ("University") claims the unchecked right to restrict the free speech rights of students who desire to conduct exhibits on campus. The University claims to encourage free discourse and debate on campus, but if students wish to conduct an exhibit on campus, they must first get approval from the Office of Student Activities. They must submit a request form at least seven days in advance, revealing, among other things, the message and purpose of their exhibit. Throughout the permitting process, the University retains unfettered discretion to impose additional requirements on the students as a condition for approving the exhibit. It requires students to agree that the University may edit the display as it sees fit and to agree that the organization sponsoring the exhibit will be identified publicly. In so doing, the University fails to protect students against content and viewpoint discrimination, requires its officials to evaluate the content and viewpoint of student expression, and requires students to waive their right to control the message they convey and their right to speak anonymously through an exhibit. These policies and practices chill protected student speech and disable spontaneous and anonymous student speech on campus.

3.    The University also claims the unchecked right to restrict the content and viewpoint of what students say on campus. Though they claim to celebrate free speech, Defendants' *Code of Student Conduct* defines "disorderly conduct" to include any expression that "causes alarm, annoyance, or nuisance." Thus, Defendants have created

and enforced a heckler's veto that effectuates content and viewpoint discrimination. This policy and its related practices chill protected student speech on campus.

4. When Plaintiffs Students for Life at MUOH and its members sought permission to conduct a pro-life exhibit on campus, Defendants enforced these speech codes in ways that ultimately shut down this peaceful display. Plaintiffs had successfully held this simple display of crosses on the University's Central Quad for years. But this fall, Defendants refused to approve the display unless Plaintiffs agreed to post warning signs around campus that effectively urged people not to view it, forcing Plaintiffs to present a "trigger warning" for their own display. When Plaintiffs explained that they did not wish to post these warning signs because they would undermine their display's purpose and message, Defendants insisted that these signs were required and that University policy authorized them to require them.

5. Defendants took these actions because of the content and viewpoint of Plaintiffs' expression, because they believed that Plaintiffs' expression would prompt complaints, and because they wanted to pacify those who might be offended by this display. In taking these actions, they implemented the challenged University policies, violated Plaintiffs' constitutional rights, and inflicted irreparable injury upon them.

6. This action is premised on the United States Constitution and concerns the denial of Plaintiffs' fundamental and clearly established rights under the Free Speech Clause of the First Amendment, the unconstitutional conditions doctrine, and the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

**JURISDICTION & VENUE**

7. This civil rights action raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

8. This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

9. This Court has authority to award the requested damages pursuant to 28 U.S.C. § 1343; the requested declaratory relief pursuant to 28 U.S.C. §§ 2201–02; the requested injunctive relief pursuant to 28 U.S.C. § 1343 and Fed. R. Civ. P. 65; and costs and attorneys' fees under 42 U.S.C. § 1988.

10. Venue is proper in this district and division pursuant to 28 U.S.C. § 1391(b) and S.D. Ohio Civ. R. 82.1 because Defendants reside in this district and division and/or all of the acts described in this Complaint occurred in this district and division.

**PLAINTIFFS**

11. Plaintiff Students for Life at Miami University of Ohio, Hamilton is an unincorporated student organization made up of University students and a recognized student organization at the University.

12. Students for Life at MUOH is founded upon the undeniable truth that all human life from the point of conception until natural death is sacred and has inherent dignity.

13. The purpose of Students for Life MUOH is to sustain this dignity through the peaceful promotion and defense of the culture of life.

14. Students for Life at MUOH seeks to awake consciousness and awareness in the University community about the catastrophic effects of abortion for all persons involved and our moral duty to stop its practice.

15. Students for Life at MUOH expresses its pro-life message on the University's campus through a variety of means including flyers, signs, peaceful demonstrations, displays, hosting tables with information, and talking with fellow students about pro-life ideas, just to name a few.

16. Part of Students for Life at MUOH's mission is to be an expressive student organization at the University and to protect its members' constitutional rights on campus.

17. Students for Life at MUOH brings this suit on behalf of itself as a recognized

4

student organization at the University and on behalf of its individual student members.

18. If Students for Life at MUOH succeeds in this lawsuit, it and its members will have the right to conduct exhibits and engage in other expression on campus, free from content- and viewpoint-based prior restraints and other restrictions, free from conditions that require it and its members to convey a University-mandated message, and free from other unconstitutional conditions upon their expression.

19. If Students for Life at MUOH succeeds in this lawsuit, the relief it requests is the same for the organization and all members.

20. Plaintiff Ellen Wittman is a student at the University and serves as the president of Students for Life at MUOH.

21. Plaintiff Margaret Bruns is a student at the University and serves as the vice president of Students for Life at MUOH.

22. Plaintiff Morgan Smith is a student at the University and serves as the treasurer of Students for Life at MUOH.

23. Plaintiff Chloe Olberding is a student at the University and serves as the secretary of Students for Life at MUOH.

24. Plaintiffs desire to express their religious, pro-life and other beliefs on campus using a variety of means including flyers, signs, peaceful demonstrations, displays, hosting tables with information, inviting speakers to campus, and talking with fellow students about pro-life ideas, just to name a few without facing censorship, restrictions, or punishment in order to inform and persuade their fellow students and others in the University community.

25. When engaged in these expressive activities, Plaintiffs discuss political, religious, social, cultural, and moral issues, events, and ideas.

### DEFENDANTS

26. Defendants Mark E. Ridenour, Robert W. Shroder, Dennis A. Lieberman, Jagdish K. Bhati, David H. Budig, Thomas W. Gunlock, John C. Pascoe, Sandra D.

Collins, Rod Robinson, Robert E. Coletti, Diane F. Perlmutter, C. Michael Gooden, John Altman, Terry Hershey, Alexandra N. Boster, and Hallie G. Jankura are, and were at all times relevant to this Complaint, members of the Board of Trustees of Miami University of Ohio (hereinafter collectively, "Trustee Defendants"), a public university organized and existing under the laws of Ohio, and are responsible for, among other things, the adoption and authorization of policies that govern students at Miami University of Ohio, including the speech codes and related policies challenged herein.

27. As members of the Board of Trustees, the Trustee Defendants have the responsibility for final policymaking authority for policies governing students at Miami University of Ohio, including Miami University of Ohio, Hamilton.

28. Each of the Trustee Defendants is responsible for the enactment, amendment, and repeal of Board of Trustees' policies, including the speech codes and the related provisions of the *Code of Student Conduct* challenged herein.

29. As members of the Board of Trustees, the Trustee Defendants possess the authority to change and enforce the policies challenged herein.

30. The Trustee Defendants have not modified the challenged policies governing student expression on campus, specifically the speech codes or the related provisions of the *Code of Student Conduct*, challenged herein to comply with the Constitution.

31. Each of the Trustee Defendants acquiesces in, sanctions, and supports the action of the other Defendants in enforcing the policies and procedures regarding students' expressive activities on campus.

32. Defendant Gregory P. Crawford is, and was at all times relevant to this Complaint, the President of Miami University of Ohio.

33. The Board of Trustees has delegated to the President of Miami University of Ohio powers to exercise discretionary authority and to perform duties vested in the Board of Trustees related to the operation, control, and management of Miami

6

University of Ohio.

34. Defendant Crawford is the chief educational and administrative officer of the Miami University of Ohio.

35. Defendant Crawford's authority and powers include oversight and control of Miami University of Ohio, Hamilton.

36. Defendant Crawford has the authority to delegate authority among subordinates, including those at Miami University of Ohio, Hamilton.

37. Defendant Crawford is responsible for enforcement of Miami University of Ohio policies, including the speech codes and the related provisions of the *Code of Student Conduct* challenged herein, and their application to Plaintiffs' speech.

38. Defendant Crawford possesses the authority and responsibility for coordination and approval of expression by students, employees, and third parties on the campus of Miami University of Ohio.

39. Defendant Cathy Bishop-Clark is, and was at all times relevant to this Complaint, the Interim Associate Provost and Dean of Miami University of Ohio, Hamilton ("University").

40. Defendant Bishop-Clark is the chief educational and administrative officer of the University.

41. Defendant Bishop-Clark has the authority to delegate authority among subordinates.

42. Defendant Bishop-Clark is responsible for enforcement of University policies, including the speech codes and the related provisions of the *Code of Student Conduct* challenged herein, and their application to Plaintiffs' speech.

43. Defendant Bishop-Clark possesses the authority and responsibility for coordination and approval of expression by students, employees, and third parties on campus.

44. Neither Defendant Crawford nor Defendant Bishop-Clark has instructed University personnel, including the other defendants, to change or alter the policies

and practices governing student expression on campus, including the speech codes, the related provisions of the *Code of Student Conduct*, and the associated practices challenged herein, to comply with constitutional mandates.

45. In their respective positions, Defendant Crawford and Defendant Bishop-Clark each has the authority to review, approve, or reject the decisions of other University officials and the other Defendants regarding the speech codes and the related provisions of the *Code of Student Conduct* challenged herein.

46. Defendant Crawford and Defendant Bishop-Clark each has authorized, approved, or implemented the speech codes and the related provisions of the *Code of Student Conduct* challenged herein.

47. Defendant Peter Haverkos is, and was at all times relevant to this Complaint, the Senior Assistant Dean for Student and Academic Success at the University.

48. Defendant Haverkos possesses the authority and responsibility for the regulation of campus expression by students.

49. Defendant Mary Bausano is, and was at all times relevant to this Complaint, the Assistant Dean for Student Success at the University.

50. Defendants Haverkos and Bausano each possesses the authority to change and enforce the University's speech codes and related provisions of the *Code of Student Conduct* challenged herein.

51. Defendant Caitlin Borges is, and was at all times relevant to this Complaint, the Director of Student Activities and Orientation at the University.

52. Defendant Haverkos and Borges, independently and in consultation with each other, enforced the University's speech codes and related provisions of the *Code of Student Conduct* against Plaintiffs and participated in the decision to require Plaintiffs to place warning and attribution signs around their exhibits as a condition for allowing those exhibits to occur.

53. Defendants Bishop-Clark, Haverkos, Bausano, and Borges each has

authority under the *Policy for Campus Exhibits* to review, approve, modify, or reject requests by students and student organizations to conduct exhibits on campus.

54. Defendants Bishop-Clark, Haverkos, Bausano, and Borges each has responsibility to review and approve or disapprove requests by students or student organizations to conduct exhibits on University property.

55. In executing this responsibility, Defendants Bishop-Clark, Haverkos, Bausano, and Borges each implements the University's speech codes and the related provisions of the *Code of Student Conduct* challenged herein.

56. Defendants Bishop-Clark, Haverkos, Bausano, and Borges, independently and in consultation with each other, are responsible for enforcing the University's speech codes and the related provisions of the *Code of Student Conduct* challenged herein and for their application to Plaintiff's speech.

57. Defendants Haverkos, Bausano, and Borges have failed to recommend any changes to the University's speech codes and the related provisions of the *Code of Student Conduct* challenged herein to comply with constitutional mandates.

58. Defendants Bishop-Clark, Haverkos, Bausano, and Borges have failed to stop University officials, including each other and the other Defendants, from applying the University's speech codes and the related provisions of the *Code of Student Conduct* challenged herein to students, including Plaintiffs.

59. Each and every Defendant is sued in his (or her) official capacity for injunctive and declaratory relief and in his (or her) individual capacity for damages resulting from the policies challenged herein.

### FACTUAL BACKGROUND

60. Miami University of Ohio, Hamilton is a public university organized and existing under the laws of the State of Ohio and receives funding from the State of Ohio to operate.

61. The University's campus is composed of various publicly-accessible buildings

and outdoor areas, including streets, sidewalks, open-air quadrangles, and park-like lawns. A map of the University's campus are attached to this Complaint as Exhibit 1. A Google Maps satellite view of the University's campus is attached to this Complaint as Exhibit 2.

62. The University's campus has many suitable streets, sidewalks, open-air quadrangles and plazas, and park-like lawns where expressive activity will not interfere with or disturb the College's activities, its campus environment, or access to its buildings or sidewalks.

63. For all of the University's students, the University's campus is their town square where they socialize and engage in a variety of expressive activities.

## I. Defendants' Unconstitutional Speech Codes

64. The University regulates students' expressive activities on campus using multiple policies that operate as unconstitutional speech codes by allowing (or even requiring) University officials to engage in content or viewpoint discrimination, to compel students to speak a message they would not voluntarily express, or to impose unconstitutional conditions upon students' freedom to speak on campus.

### A. Defendants' *Policy for Campus Exhibits*

65. The University regulates exhibits students choose to display on campus through its *Policy for Campus Exhibits*. A true, correct, and complete copy of this policy is attached to this Complaint as Exhibit 3.

66. As detailed in subsequent paragraphs, Plaintiffs challenge, facially and as-applied, the provisions of Defendants' *Policy for Campus Exhibits* that:

- Require students to seek a permit to conduct an exhibit on campus at least seven days in advance, *see* Ex. 3 at 3 (requiring submission of the form "at least 7 business days prior to displaying the exhibit"); *see also infra* ¶¶ 67–74;

- Require students to inform University officials of the message and purpose of their exhibit so that officials may consider the content and viewpoint of

10

the exhibit in determining whether to approve it, *see* Ex. 3 at 4 (requiring students to detail "what [their] exhibit will look like, what message it will send, and what is the purpose behind the exhibit"); *see also infra* ¶ 75;

- Require students to agree that University officials may manipulate the content of their exhibits or close down those exhibits in order to seek a permit, *see* Ex. 3 at 4 (requiring students to "acknowledge that the Office of Student Activities has the right to edit, reject, or remove my exhibit from display"); *see also infra* ¶¶ 76–79;

- Require students to waive their right to speak anonymously in order seek a permit to conduct exhibits on campus, *see* Ex. 3 at 4 (requiring students to "agree that contact information will be displayed next to the exhibit for patrons who have questions or concerns"); *see infra* ¶¶ 80–81;

- Give University officials unbridled discretion to manipulate the content of a display or close it down, *see* Ex. 3 at 4 (giving officials "the right to edit, reject, or remove my exhibit from display"); *see also infra* ¶¶ 76–79;

- Give University officials unbridled discretion in deciding whether an exhibit "honor[s] the privacy of individuals" and what students must do to satisfy this requirement, *see* Ex. 3 at 1; *see also infra* ¶¶ 83–85;

- Give University officials unbridled discretion in deciding whether an exhibit "protects the rights and freedoms of those who choose not to participate" in it and what students must do to satisfy this requirement, *see* Ex. 3 at 2; *see also infra* ¶¶ 86–88;

- Give University officials unbridled direction in deciding whether an exhibit meets their standard for "appropriateness" and what students must do to satisfy this requirement, *see* Ex. 3 at 3; *see also infra* ¶¶ 89–94.

- Give University officials unbridled discretion in ultimately deciding whether an exhibit should be allowed and in deciding who may contribute

11

to this decision; *see* Ex. 3 at 3; *see also infra* ¶¶ 93–106.

- Give University officials unbridled discretion in deciding when and whether to waive the requirements of this policy; *see infra* ¶¶ 107–09.

67. Under this policy, the University defines a "campus exhibit" as "a temporary, physical display of objects in a public space on campus designed to promote discussion." Ex. 3 at 1.

68. Defendants' *Policy for Campus Exhibits* applies to exhibits students may wish to display because "[a]ll students, alumni, faculty, and staff who wish to display an exhibit on the Hamilton . . . campus must abide by this policy." Ex. 3 at 1.

69. Defendants make it clear in this policy that, in their view, the "opportunity to display and exhibit is a privilege, and not a right." Ex. 3 at 1.

70. To conduct an exhibit on campus, students must get approval from the Office of Student Activities.

71. Under this policy, "[a]ll campus exhibits must be approved through the Office of Student Activities on Miami's Regional Campuses." Ex. 3 at 1.

72. To get this approval, students must "complete the Miami University Regionals Campus Exhibit Approval Form and submit [it] to the Office of Student Activities at least ten (10) business days prior to the first day of the exhibit display." Ex. 3 at 1.

73. Elsewhere, the policy indicates that students must submit this approval form "at least 7 business days prior to displaying the exhibit." Ex. 3 at 3.

74. Defendants' *Policy on Campus Exhibits* contains no provision allowing students to conduct an exhibit spontaneously, such as in reaction to breaking news.

75. To complete the approval form, students must inform University officials "what [their] exhibit will look like, what message it will send, and what is the purpose behind the exhibit." Ex. 3 at 4.

76. To complete the approval form, students must allow University officials to edit their exhibits, with no limits on this editing power whatsoever.

77. By signing the approval form, students "acknowledge that the Office of Student Activities has the right to edit, reject, or remove my exhibit from display." Ex. 3 at 4.

78. Defendants' *Policy for Campus Exhibits* contains no objective or comprehensive guidelines, standards, or criteria to limit the discretion of Defendants and other University officials in deciding when and how to "edit, reject, or remove" student exhibits.

79. Upon information and belief, Defendants do not possess any policies that set forth objective or comprehensive guidelines, standards, or criteria to limit the discretion of Defendants and other University officials in deciding when and how to "edit, reject, or remove" student exhibits.

80. To complete the approval form, students must also agree to waive any rights to engage in anonymous expression on campus through the display.

81. By signing the approval form, students "agree that contact information will be displayed next to the exhibit for patrons who have questions or concerns." Ex. 3 at 4.

82. In addition, to get approval from University officials, exhibits must, among other things, "[c]onform to all college policies." Ex. 3 at 1; *see also* Ex. 3 at 2 ("Demonstrations must comply with all applicable . . . University policies. . . .").

83. To get approval from University officials, exhibits must also "honor the privacy of individuals." Ex. 3 at 1.

84. Defendants' *Policy for Campus Exhibits* contains no objective or comprehensive guidelines, standards, or criteria to limit the discretion of Defendants and other University officials in deciding whether a specific exhibit "honor[s] the privacy of individuals" or what students and student organizations must do to satisfy this ephemeral standard.

85. Upon information and belief, Defendants do not possess any policies that set forth objective or comprehensive guidelines, standards, or criteria to limit the discretion of Defendants and other University officials in deciding whether a specific exhibit "honor[s] the privacy of individuals" or what students and student organizations must

do to satisfy this ephemeral standard.

86. In this policy, Defendants acknowledge that students have "the rights of expression, affiliation, and peaceful assembly," but they claim to have "an equal and co-extensive obligation to protect the rights and freedoms of those who choose not to participate in a demonstration." Ex. 3 at 2.

87. Defendants' *Policy for Campus Exhibits* contains no objective or comprehensive guidelines, standards, or criteria to limit the discretion of Defendants and other University officials in deciding whether a specific exhibit adequately protects the rights of non-participants or what students and student organizations must do to satisfy this ephemeral standard.

88. Upon information and belief, Defendants do not possess any policies that set forth objective or comprehensive guidelines, standards, or criteria to limit the discretion of Defendants and other University officials in deciding whether a specific exhibit adequately protects the rights of non-participants or what students and student organizations must do to satisfy this ephemeral standard.

89. According to Defendants' *Policy for Campus Exhibits*, once students complete the approval form, numerous University officials must review and approve the exhibit before it can take place.

90. First, officials in the Office of Student Activities must review the "form for contact information, appropriateness, safety concerns, maintenance and removal plan, and scheduling." Ex. 3 at 3.

91. Defendants' *Policy for Campus Exhibits* contains no objective or comprehensive guidelines, standards, or criteria to limit the discretion of Defendants and other University officials in deciding whether a specific exhibit is appropriate for the University community.

92. Upon information and belief, Defendants do not possess any policies that set forth objective or comprehensive guidelines, standards, or criteria to limit the

discretion of Defendants and other University officials in deciding whether a specific exhibit is appropriate for the University community.

93.  Defendants' *Policy for Campus Exhibits* does not provide that these are the only reasons that requests to conduct exhibits on campus may be denied, it does not guarantee that requests that satisfy these considerations will be granted, and it does not prohibit University officials from basing their decisions on other unspecified and unwritten considerations.

94.  Thus, Defendants' *Policy for Campus Exhibits* allows Defendants to deny a student's or student organization's request to conduct an exhibit on campus even if it satisfies all of these considerations.

95.  Once the Office of Student Activities approves the exhibit, the Physical Facilities Department must do the same. Ex. 3 at 3.

96.  Defendants' *Policy for Campus Exhibits* contains no objective or comprehensive guidelines, standards, or criteria to limit the discretion of officials in the Physical Facilities Department in deciding whether to approve, reject, or impose conditions upon a student's or student organization's request to conduct an exhibit.

97.  Upon information and belief, Defendants do not possess any policies that set forth objective or comprehensive guidelines, standards, or criteria to limit the discretion of officials in the Physical Facilities Department in deciding whether to approve, reject, or impose conditions upon a student's or student organization's request to conduct an exhibit.

98.  After the Physical Facilities Department approves the exhibit, the Campus Dean (*i.e.*, Defendant Bishop-Clark) must review it. Ex. 3 at 3.

99.  Defendants' *Policy for Campus Exhibits* contains no objective or comprehensive guidelines, standards, or criteria to limit the discretion of the Campus Dean in deciding whether to approve, reject, or impose conditions upon a student's or student organization's request to conduct an exhibit.

15

100. Upon information and belief, Defendants do not possess any policies that set forth objective or comprehensive guidelines, standards, or criteria to limit the discretion of the Campus Dean in deciding whether to approve, reject, or impose conditions upon a student's or student organization's request to conduct an exhibit.

101. At this stage, "[o]ther critical campus partners may be involved in the approval of the exhibit. This could include, but is not limited to, Student Affairs, academic departments, Enrollment Management, and Security." Ex. 3 at 3.

102. Defendants' *Policy for Campus Exhibits* contains no objective or comprehensive guidelines, standards, or criteria to limit the discretion of Defendants and other University officials in deciding who should help determine whether to approve, reject, or impose conditions upon a student's or student organization's request to conduct an exhibit.

103. Upon information and belief, Defendants do not possess any policies that set forth objective or comprehensive guidelines, standards, or criteria to limit the discretion of Defendants and other University officials in deciding who should help determine whether to approve, reject, or impose conditions upon a student's or student organization's request to conduct an exhibit.

104. Defendants' *Policy for Campus Exhibits* contains no objective or comprehensive guidelines, standards, or criteria to limit the discretion of Defendants or these "[o]ther critical campus partners" in determining whether to approve, reject, or impose conditions upon a student's or student organization's request to conduct an exhibit.

105. Upon information and belief, Defendants do not possess any policies that set forth objective or comprehensive guidelines, standards, or criteria to limit the discretion of Defendants or these "[o]ther critical campus partners" in determining whether to approve, reject, or impose conditions upon a student's or student organization's request to conduct an exhibit.

106. Once the Campus Dean approves the display, the Office of Student Activities

16

"contacts the student organization with signed approval form for exhibit." Ex. 3 at 3.

107. However, as Plaintiffs experienced, Defendants have discretion to waive all or part of this extensive review process whenever they see fit.

108. Defendants' *Policy for Campus Exhibits* contains no objective or comprehensive guidelines, standards, or criteria to limit the discretion of Defendants or other University officials in determining when or whether to waive all or part of the policy's requirements.

109. Upon information and belief, Defendants do not possess any policies that set forth objective or comprehensive guidelines, standards, or criteria to limit the discretion of Defendants or other University officials in determining when or whether to waive all or part of the policy's requirements.

110. Defendants' *Policy for Campus Exhibits* contains no brief or specified time limit by which any level of review of a student's request to conduct an exhibit on campus must be completed or by which an ultimate decision must be given to the requesting student.

## B. Defendants' *Right of Expression of Students Policy*

111. Defendants also restrict student expression using their *Right of Expression of Students Policy*, which is part of their *Student Handbook*. A true, correct, and complete copy of this policy is attached to this Complaint as Exhibit 4.

112. As detailed in subsequent paragraphs, Plaintiffs challenge, facially and as-applied, the provisions of Defendants' *Right of Expression of Students Policy* that:

- Give University officials unbridled discretion in deciding whether expression "protect[s] the rights and freedoms of those who choose not to participate" in it and what students must do to satisfy this requirement, *see* Ex. 4 at 1; *see also infra* ¶¶ 113–15;

- Prohibit students from conducting any display or engaging in any expression that "causes alarm, annoyance, or nuisance" and that deem any such

17

expression "disorderly conduct," *see* Ex. 4 at 2; Ex. 5 at 4; *see also infra* ¶¶ 117–21;

- Give University officials unbridled discretion in deciding when student expression "causes alarm, annoyance, or nuisance" and thus constitutes "disorderly conduct," *see* Ex. 4 at 2; Ex. 5 at 4; *see also infra* ¶¶ 117–21.

113. While Defendants state that they will "make every reasonable effort" to protect students' right of expression, they also claim that they have "an equal and simultaneous obligation to protect the rights and freedoms of students who do not choose to participate in a demonstration." Ex. 4 at 1.

114. Defendants' *Right of Expression of Students Policy* contains no objective or comprehensive guidelines, standards, or criteria to limit the discretion of Defendants and other University officials in deciding whether student expression (including a specific exhibit) adequately protects the rights of non-participants or what students and student organizations must do to satisfy this ephemeral standard.

115. Upon information and belief, Defendants do not possess any policies that set forth objective or comprehensive guidelines, standards, or criteria to limit the discretion of Defendants and other University officials in deciding whether student expression (including a specific exhibit) adequately protects the rights of non-participants or what students and student organizations must do to satisfy this ephemeral standard.

116. In this policy, the Trustee Defendants have prohibited "all persons, including University . . . students" from "engaging or participating in, or aiding or abetting" certain actions. Ex. 4 at 1.

117. One of these prohibited actions is "disorderly conduct." Ex. 4 at 2.

118. Defendants' *Student Handbook* contains Defendants' *Code of Student Conduct*.

119. In their *Code of Student Conduct,* Defendants define "disorderly conduct" to include "[c]onduct . . . which breaches the peace (*e.g.*, causes alarm, annoyance, or

18

nuisance)." A true, accurate, and complete copy of the section of Defendants' *Code of Student Conduct* that outlines conduct prohibited to students, including this definition of disorderly conduct in § 2.1.M, is attached to this Complaint as Exhibit 5.

120. Defendants' *Code of Student Conduct* and *Right of Expression of Students Policy* contain no objective or comprehensive guidelines, standards, or criteria to limit the discretion of Defendant or other University officials in determining when or whether student expression "causes alarm, annoyance, or nuisance," and therefore constitutes "disorderly conduct." Ex. 5 at 4.

121. Upon information and belief, Defendants do not possess any policies that set forth objective or comprehensive guidelines, standards, or criteria to limit the discretion of Defendant or other University officials in determining when or whether student expression "causes alarm, annoyance, or nuisance," and therefore constitutes "disorderly conduct." Ex. 5 at 4.

### C. Defendants' *Code of Student Conduct*

122. It is the University's policy and practice to enforce its speech codes outlined above against its students.

123. Defendants implement and enforce their speech codes outlined above in part through the University's *Code of Student Conduct.*

124. Defendants challenge the following provisions of the *Code of Student Conduct* only insofar as they are used to enforce the unconstitutional speech codes outlined above.

125. Students violate the *Code of Student Conduct* if they engage in the "unauthorized use of property of the University." Ex. 5 § 2.1.D.

126. Students violate the *Code of Student Conduct* if they violate "other published university rules, policies, standards, [or] guidelines." Ex. 5 § 2.1.J.

127. Students are also prohibited from failing "to follow University policies, procedures, or regulations." Ex. 5 § 2.1.Q.

128. It is the University's policy—as expressed in its *Policy for Campus Exhibits*,

*Right of Expression of Students Policy*, and *Code of Student Conduct*—that students or student organizations who conduct exhibits on campus without receiving University approval have violated these three provisions of the *Code of Student Conduct*.

129. Defendants' *Code of Student Conduct* makes it clear that a "student may be suspended or dismissed for a single violation" of the *Code of Student Conduct* and that "[m]ultiple violations or additional violations . . . may result in more severe sanctions." Ex. 5 at 1.

130. Defendants' *Code of Student Conduct* also provides that student organizations "are subject to this Code of Student Conduct at all times." The section of Defendants' *Code of Student Conduct* that outlines organizational responsibility is attached to this Complaint as Exhibit 6.

131. Under Defendants' *Code of Student Conduct*, an organization "may be held responsible for a violation of University policy or rule" when "one or more of its officers, members, or authorized representatives acting as a member of the organization commit the violation." Ex. 6 at 2.

132. Under Defendants' *Code of Student Conduct*, an organization "may be held responsible for a violation of University policy or rule" the violation takes place at an organization event or on the organization's property and "it is reasonable to believe that the organization's members knew or should have known that one or more of the participants engaged in conduct that is in violation of this Code." Ex. 6 at 2.

133. Students who violate the University's *Code of Student Conduct* expose themselves and their organization to a variety of disciplinary sanctions, ranging from a reprimand to dismissal. The section of Defendants' *Code of Student Conduct* that outlines possible sanctions is attached to this Complaint as Exhibit 7.

## II. Defendants' Unconstitutional Restriction of Plaintiffs' Expression

### A. Plaintiffs' Previous and Successful Cemetery of the Innocents Displays

134. For at least the past three academic years, Students for Life of MUOH has

shared its pro-life message with the University community through a Cemetery of the Innocents display.

135. The Cemetery of the Innocents display consists of small crosses placed in the ground in a confined area to represent the lives lost to abortion.

136. These past Cemetery of the Innocents displays have persuaded multiple women who were pregnant and considering abortion to change their minds and choose life for their unborn children.

137. In March 2015, Students for Life at MUOH conducted a Cemetery of the Innocents display for two weeks on the Central Quad on campus.

138. The Central Quad is the grassy area on the University's campus bordered by the Parrish Auditorium, Wilks Conference Center, Schwarm Hall and Renschler Library (which are housed in the same building), Mosler Hall, and Retschler Hall.

139. Defendants did not require Students for Life at MUOH to complete the Campus Exhibit Approval Form referenced in Defendants' *Policy for Campus Exhibits*.

140. Shortly after Students for Life at MUOH erected the Cemetery of the Innocents display, Dr. Theresa Kulbaga, a Women's Studies professor at the University, noticed it and objected to the message it conveyed.

141. Dr. Kulbaga mentioned the display in one of her classes, saying: "If they can put it up, we can take it down."

142. Dr. Kulbaga then encouraged students to join her in vandalizing the display by ripping the crosses and other sign out of the ground.

143. Dr. Kulbaga then led the students who followed her leading and encouragement to the display and, with their assistance, removed every cross and sign constituting the display from the ground.

144. After this, Students for Life at MUOH set the Cemetery of the Innocents display up once again, and there were no further incidents of significant vandalism.

145. Despite this act of vandalism instigated by a University professor, the

Cemetery of the Innocents display took place without any damage to University property and without any disruption to the University community.

146. In November 2015, Students for Life at MUOH again conducted the Cemetery of the Innocents display for two weeks on the Central Quad on campus.

147. In November 2015, Students for Life at MUOH conducted the Cemetery of the Innocents display without any incident, without any damage to University property, and without any disruption to the University community.

148. In the fall of 2016, Students for Life at MUOH sought to conduct the Cemetery of the Innocents display for two weeks on the Central Quad.

149. On October 17, 2016, Miss Wittman e-mailed Defendant Haverkos, seeking to conduct this display from October 23, 2016 to November 6, 2016 on the Central Quad. A true, correct, and complete copy of the e-mail exchange between Miss Wittman and Defendant Haverkos is attached to this Complaint as Exhibit 8.

150. In that e-mail, Miss Wittman explained that the Cemetery of the Innocents display consists of "a few hundred white crosses that represent abortion victims" and "a sign with the crosses that explains the display." Ex. 8 at 1.

151. Exercising their discretion under their *Policy for Campus Exhibits,* Defendants waived the requirement that Miss Wittman or Students for Life at MUOH complete the Campus Exhibit Approval Form referenced in that policy.

152. The next day, Defendant Haverkos responded to Miss Wittman's e-mail, saying simply: "Your request is approved. Please get with Scott Brown, Director of Physical Facilities, to coordinate the installation and removal of your display." Ex. 8 at 1.

153. The same day (*i.e.*, October 18, 2016), Miss Wittman e-mailed Mr. Brown, informing him that Defendant Haverkos had approved the display, describing the crosses, and noting the dates on which it would begin and end. A true, correct, and complete copy of the e-mail exchange between Miss Wittman and Mr. Brown is attached to this Complaint as Exhibit 9.

154. The day after the Cemetery of the Innocents display began, Defendant Borges e-mailed Miss Wittman with a last-minute requirement. A true, accurate, and complete copy of the e-mail exchange between Defendant Borges and Miss Wittman is attached as Exhibit 10.

155. Defendant Borges required Miss Wittman and Students for Life at MUOH to "to place a visible, readable sign out with your display that indicates that the display is sponsored by the <u>Students for Life Organization</u>." Ex. 10 at 1.

156. Defendant Borges required Miss Wittman and Students for Life at MUOH to "have this sign in place by 10:00 am Wednesday morning." Ex. 10 at 1.

157. In requiring Students for Life at MUOH to erect this attribution sign, Defendant Borges exercised her authority under Defendants' *Policy on Campus Exhibits* to edit Student for Life at MUOH's display.

158. In requiring Students for Life at MUOH to erect this attribution sign, Defendant Borges exercised her authority under Defendants' *Policy on Campus Exhibits* to require Student for Life at MUOH to display contact information next to the exhibit.

159. Upon information and belief, in requiring Students for Life at MUOH to erect this attribution sign, Defendant Borges acted either at the direction of Defendant Haverkos or with his knowledge and acquiescence.

160. While Students for Life at MUOH retains its constitutional right to engage in anonymous expression, it elected to display an attribution sign, as Defendant Borges mandated, that read: "Display by Students for Life."

161. At some point during the display, someone pulled about ten of the crosses out of the ground. Miss Wittman quickly discovered this, replaced the crosses, and notified University security, which increased patrols in the area. No further vandalism to the display occurred.

162. The day after the display began, students in several University classes (*i.e.*, WGS 201 and ENG/WGS 368) erected a display of their own on the Central Quad,

23

entitled "Reproductive Justice."

163. Placed right next to the Cemetery of the Innocents display, the "Reproductive Justice" display consisted of at least six signs either placed on the lawn or held up by stakes driven into the lawn that expressed pro-abortion messages. Some students also distributed leaflets expressing pro-abortion views to passersby.

164. Upon information and belief, Defendants did not require the students in these two classes to submit the Campus Exhibit Approval Form required by their *Policy for Campus Exhibits*.

165. Upon information and belief, Defendants did not require the students in these two classes to submit the Campus Exhibit Approval Form seven (or ten) days in advance as required by their *Policy for Campus Exhibits*.

166. Despite Defendant Borges' interference, Students for Life at MUOH once again conducted the Cemetery of the Innocents display without any incident, without any damage to University property, and without any disruption to the University community.

**B. Plaintiffs' Latest and Unsuccessful Cemetery of the Innocents Display**

167. In the fall of 2017, Students for Life at MUOH again desired to conduct the Cemetery of the Innocents display on the Central Quad on campus.

168. Students for Life at MUOH began planning for the Cemetery of the Innocents display in its first organizational meeting for the fall semester in early September 2017 and continued discussing it during later organizational meetings.

169. The officers of Students for Life at MUOH (*i.e.*, Misses Wittman, Bruns, Smith, and Olberding) met separately during September and October 2017 to plan the logistical details for this display.

170. On October 2, 2017, Miss Wittman made all the necessary arrangements for Students for Life at MUOH to obtain crosses for this display.

171. On October 22, 2017, Miss Wittman e-mailed Defendant Borges, requesting

to hold the Cemetery of the Innocents display from October 29, 2017 to November 12, 2017. A true, accurate, and complete copy of this e-mail is attached to this Complaint as Exhibit 11.

172. In this e-mail, Miss Wittman noted that this display was Students for Life at MUOH's "annual Cross Display" and that the group wanted to hold the display on the "Central Quad." Ex. 11 at 1.

173. Students for Life at MUOH and its members wanted to conduct the Cemetery of the Innocents display on the Central Quad because that is a hub of pedestrian traffic on campus and a display held there would maximize the number of students and other people at the University who would see it.

174. On October 24, 2017, Defendant Borges responded, saying that she "passed this along to Pete [*i.e.*, Defendant Haverkos] for approval" and promising to "get back with you once I hear from Pete." Ex. 11 at 1.

175. By October 26, 2017, Defendant Borges had not responded with any word from Defendant Haverkos, and so Miss Wittman e-mailed her once again, asking if she had heard from him regarding the display. A true, accurate, and complete copy of this e-mail exchange is attached to this Complaint as Exhibit 12.

176. Later that afternoon, Defendant Borges responded, noting that she had "touched base with Pete this afternoon" and making several points. Ex. 12 at 2.

177. Upon information and belief, Defendant Borges sent this e-mail after consulting with, or at the direction of, Defendant Haverkos.

178. Upon information and belief, the requirements Defendant Borges communicated in this e-mail and the rationale behind them either originated with Defendant Haverkos or were approved by Defendant Haverkos.

179. First, Defendant Borges noted that "the quad space is already reserved for Hero's Week November 6th–November 10th." As a result, Students for Life of MUOH would have to "remove the display on Sunday, November 5th." Ex. 12 at 2.

180. Miss Wittman responded by saying: "One week for the display is perfectly fine, and we will put it up this Sunday, October 29, as planned." Ex. 12 at 1.

181. Second, Defendant Borges announced that the Office of Student Activities was "asking that you do something additional this year," informing the group that it must place signs around campus, warning people that the Cemetery of the Innocents display was occurring. Ex. 12 at 2.

182. Specifically, Defendant Borges instructed Students for Life at MUOH to place these signs "near the entrances to campus off of the parking lot to notify community members that the display is there. You can say something like, 'The Students for Life are displaying their annual Cross Display from October 29th–November 5th. Please contact Ellie Wittman with questions.'" Ex. 12 at 2.

183. Defendant Borges then proceeded to explain that she was imposing this additional requirement because of the reactions people might have to the Cemetery of the Innocents display, explaining she "had a number of folks reach out to me to raise their concerns about the display." Ex. 12 at 2.

184. Defendant Borges went on to say that the Cemetery of the Innocents display "is quite polarizing and causes a lot of unrest on campus." Ex. 12 at 2.

185. In actuality, Students for Life at MUOH had conducted the Cemetery of the Innocents display at least three times in the past three academic years without it causing any unrest on campus.

186. In actuality, the only significant disruption to the Cemetery of the Innocents display occurred because Dr. Kulbaga, a University professor, directed students to vandalize the display in March 2015. The only other vandalism was minor and quickly addressed with increased patrols from University security.

187. The only other visible reaction to the Cemetery of the Innocents display was that other students chose to exercise their constitutional right to express their own views on the issue of abortion, without disrupting any events on campus.

26

188. Defendant Borges explained that she imposed this warning sign requirement on Students for Life at MUOH because she feared that the display might cause "emotional trauma" for those who might view it and because she wanted to help these individuals "better protect and manage their emotional reactions to the display." Ex. 12 at 2.

189. Defendant Borges closed her e-mail by stating that she would be "really happy to sit down and talk with you about ways to promote your mission in the future that may be less harmful for some of our community members." Ex. 12 at 2.

190. In saying all of this, Defendant Borges made it clear that she imposed this additional requirement on Students for Life at MUOH after evaluating the content and viewpoint of its expression, including possible reactions to the display.

191. Because Defendant Borges characterized this warning sign requirement as a request, Miss Wittman responded, asking: "As far as the signs you mentioned, are you just asking us to use them? Or is this a requirement for us to hold this event?" Ex. 12 at 1.

192. Miss Wittman went on to explain that Students for Life at MUOH did not want to erect warning signs around campus because those signs would detract from its display and prevent it from interacting with some of the very individuals Defendant Borges described, explaining: "I completely understand the emotions of some our community members might experience by seeing this display and I really appreciate you pointing this out to me. However, as an advocate for pregnant and parenting students, as well as mothers healing from loss, I am afraid posting these signs will turn away the very women we would like to help." Ex. 12 at 1–2.

193. After noting how Students for Life at MUOH and its members "really understand the emotional trauma associated with abortion" and seek to connect students suffering from this trauma "to local pregnancy and healing centers," Miss Wittman reiterated how the mandated warning signs would interfere with the purpose of the

27

Cemetery of the Innocents display: "Once again, I'm fearful that these women, scared off by these signs, will not be able to find the help they desperately need and that we are trying to offer." Ex. 12 at 2.

194. Within a few hours, Defendant Borges replied, stating: "The signs are required." Ex. 12 at 1.

195. Upon learning that the warning signs were required, Miss Wittman inquired via e-mail as to what policy required Students for Life at MUOH to erect these signs. Ex. 12 at 1.

196. On October 30, 2017, Defendant Borges responded, identifying two policies that allowed University officials to impose this warning sign requirement. Ex. 12 at 1.

197. The first policy, which Defendant Borges attached to her e-mail, was the University's *Policy for Campus Displays*. *See* Ex. 3; *see also* Ex. 12 at 5–9.

198. Defendant Borges explained that she had not required Miss Wittman to complete the Campus Exhibit Approval Form required by the University's *Policy for Campus Displays* because "we had the information from you via e-mail (your message, your removal plan, approval from Scott, etc.) and we work with you each year on this display." Ex. 12 at 1.

199. The second policy, to which Defendant Borges provided an internet link, was Defendants' *Right of Expression of Students Policy*. *See* Ex. 4.

200. In providing a link to Defendants' *Right of Expression of Students Policy*, Defendant Borges directed Miss Wittman's attention to the "second paragraph." Ex. 12 at 1.

201. The second paragraph of Defendants' *Right of Expression of Students Policy* reads as follows: "The University also has an equal and simultaneous obligation to protect the rights and freedoms of students who do not choose to participate in a demonstration. Similarly, the University is obligated to protect its property and to prohibit interference with scheduled activities of students, University personnel, and

28

guests on the campus." Ex. 4 at 1.

202. Hence, Defendants imposed this warning sign requirement on Students for Life at MUOH in an effort to "protect" students and others who might view the Cemetery of the Innocents display from the message communicated by that display.

203. In requiring Students for Life at MUOH to place warning signs around campus, Defendants enforced their speech codes (*i.e.*, the challenged provisions of the *Policy for Campus Displays* and *Right of Expression of Students Policy* and the related provisions of the *Code of Student Conduct*).

## C. Impact of Defendants' Policies & Actions on Plaintiffs

204. After all of these e-mails, it was clear to Students for Life of MUOH and its members that Defendants would allow them to conduct the Cemetery of the Innocents display only if they agreed to erect warning signs around campus.

205. It was clear to Students for Life at MUOH and its members that Defendants required them to erect these warning signs so that they would serve as a "trigger warning" to individuals on campus (*i.e.*, a warning that the individual is about to encounter something he might consider offensive).

206. It was also clear to Students for Life at MUOH and its members that these required warning signs would dissuade members of the University community and campus guests from viewing the Cemetery of the Innocents display and send a message to the campus community that this display of crosses was somehow dangerous or harmful.

207. Students for Life at MUOH and its members therefore concluded that conducting the display would not be worthwhile as Defendants' required warning signs would minimize the audience, thwart the overall purpose and impact of the display, and damage their reputations by characterizing their message to the University community as dangerous or harmful.

208. Students for Life at MUOH and its members also objected to being forced to

29

convey the message Defendants forced them to convey through these warning signs.

209. As a result of Defendants' warning sign requirement, Students for Life at MUOH elected not to conduct the display beginning on October 29, 2017.

210. Since then, Students for Life at MUOH has not attempted to engage in any expressive activities in any open, outdoor, generally accessible areas of campus.

211. Students for Life at MUOH and its members desire to conduct the Cemetery of the Innocents display on the Central Quad, without having to erect any warning signs, at the earliest opportunity.

212. Students for Life at MUOH and its members desire to have the option to express themselves anonymously through exhibits from time to time.

213. Students for Life at MUOH and its members desire to have the option of conducting spontaneous exhibits from time to time in response to current events and developing news.

214. Students for Life at MUOH has not attempted to engage in any expressive activities in any open, outdoor, generally accessible areas of campus because University policies allow Defendants to require it to erect warning signs around those activities that thwart the purpose of holding such activities and because numerous University officials, including Defendants, have enforced these policies against it.

215. Students for Life at MUOH has not attempted to engage in any anonymous exhibits in any open, outdoor, generally accessible areas of campus because University policies require them to waive that right to seek the required permit and because numerous University officials, including Defendants, have enforced these policies against it. Thus, it and its members would face disciplinary action if they were to engage in such activities.

216. Defendants' *Right of Expression of Students Policy* and their enforcement of it burdens the free speech of Students for Life at MUOH and its members because they are prohibited from saying anything that might "cause[] alarm, annoyance, or

nuisance" to anyone who happens to hear or view their expression lest they be punished for "disorderly conduct." Ex. 5 at 4.

**D. Defendants' Vastly Different Treatment of Other Groups & Displays**

217. Defendants enforce their speech codes very differently to groups and displays that communicate other messages.

218. Beginning on October 24, 2016, Defendants allowed students from two classes (*i.e.*, WGS 201 and ENG/WGS 368) to conduct a "Reproductive Justice" display on the Central Quad.

219. This display could have caused some individuals, particularly parents who regret an abortion, to experience the same "emotional trauma" that Defendant Borges and Haverkos feared that some would experience when viewing the Cemetery of the Innocents display. Ex. 12 at 2.

220. Miss Wittman and Miss Bruns saw the "Reproductive Justice" display several times as it was being held on the Central Quad.

221. Miss Wittman and Miss Bruns did not see any warning signs placed around campus, alerting members of the University community or campus guests that the Reproductive Justice display was being held on the Central Quad.

222. Defendants did not require the students from WGS 201 and ENG/WGS 368 to place warning signs around campus, warning people of their "Reproductive Justice" display.

223. On November 16, 2016, Miami University Hamilton Pride ("MUH Pride") conducted a display as part of Trans Day of Remembrance on the University's Central Quad.

224. MUH Pride's display for Trans Day of Remembrance consisted of small plastic flags placed in the ground on the Central Quad, with messages chalked on the sidewalk noting the name of the occasion.

225. This display could have caused some individuals to experience "emotional

31

trauma" upon seeing it, just as Defendant Borges and Haverkos feared would happen with the Cemetery of the Innocents display. Ex. 12 at 2.

226. Miss Wittman viewed this display several times while it was underway on the Central Quad.

227. Miss Wittman did not see any signs identifying MUH Pride as the sponsoring organization or providing any contact information for individuals who might have questions about the display.

228. Upon information and belief, Defendants did not require MUH Pride to erect signs identifying it as the sponsoring organization or providing contact information for those who viewed the display as a condition of being allowed to conduct the display on the Central Quad.

229. Miss Wittman did not see any warning signs placed around campus, alerting members of the University community or campus guests that MUH Pride's display was being held on the Central Quad.

230. Upon information and belief, Defendants did not require MUH Pride to erect warning signs around campus as a condition of being allowed to conduct this display on the Central Quad.

231. On October 2–6, 2017, MUH Pride conducted the Clothesline Project display on the Central Quad.

232. The Clothesline Project display addresses violence against women, and as part of this display, women affected by violence create and then display a shirt expressing their emotions.

233. This display could have caused some individuals, particularly victims of such violence, to experience the same "emotional trauma" that Defendant Borges and Haverkos feared that some would experience when viewing the Cemetery of the Innocents display. Ex. 12 at 2.

234. Miss Wittman, Miss Bruns, and Miss Olberding viewed the Clothesline

Project display when it was held on the Central Quad.

235. Miss Wittman, Miss Bruns, and Miss Olberding did not see any warning signs, alerting members of the University community or campus guests that the Clothesline Project display was being held on the Central Quad.

236. Upon information and belief, Defendants did not require MUH Pride to erect warning signs around campus as a condition of being allowed to conduct the Clothesline Project display on the Central Quad.

### STATEMENTS OF LAW

237. At all times relevant to this Complaint, each and all of the acts alleged herein were attributed to the Defendants who acted under color of a statute, regulation, custom, or usage of the State of Ohio (*i.e.*, under color of state law and authority).

238. Defendants knew or should have known that by imposing requirements on Plaintiffs due to the way other people might react to Plaintiffs' display, Defendants violated their constitutional rights.

239. Defendants knew or should have known that by requiring Plaintiffs to reveal the purpose and message of their exhibits so that University officials could evaluate both when deciding whether to grant a permit for the exhibit, Defendants violated Plaintiffs' constitutional rights.

240. Defendants knew or should have known that by granting University officials unbridled discretion when deciding whether to grant or deny a permit for Plaintiffs' exhibit, Defendants violated Plaintiffs' constitutional rights.

241. Defendants knew or should have known that by conditioning Plaintiffs' right to conduct a display in a public forum on campus on Plaintiffs' willingness to communicate a University-mandated message, Defendants violated Plaintiffs' constitutional rights.

242. Defendants knew or should have known that by conditioning Plaintiffs' right to conduct a display in a public forum on campus on Plaintiffs' willingness to identify

themselves to the entire campus community, Defendants violated Plaintiffs' constitutional rights.

243. Defendants knew or should have known that by conditioning Plaintiffs' right to conduct a display in a public forum on campus on Plaintiffs' willingness to let the University manipulate the display's content or shut down the display, Defendants violated Plaintiffs' constitutional rights.

244. The policies and practices that led to the violation of Plaintiffs' constitutional rights remain in full force and effect.

245. Plaintiffs are suffering irreparable harm from the policies and practices of Defendants which cannot be fully compensated by an award of money damages.

246. Plaintiffs have no adequate or speedy remedy at law to correct or redress the deprivation of their rights by Defendants.

247. Defendants' actions and policies, as set forth above, do not serve any legitimate or compelling state interest.

248. Defendants have deprived, and continue to deprive, Plaintiffs of their clearly established rights under the United States Constitution, as set forth in the causes of action below.

249. Unless the policies and conduct of Defendants are enjoined, Plaintiffs will continue to suffer irreparable injury.

250. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to appropriate relief invalidating Defendants' speech codes, along with the related policies and practices.

### FIRST CAUSE OF ACTION
### Violation of Plaintiffs' First Amendment Right to Freedom of Speech
### Content & Viewpoint Discrimination, Prior Restraints in a Public Forum
### (42 U.S.C. § 1983)

251. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1–250 of this Complaint, as if set forth fully herein.

252. Speech, including public static displays, is entitled to comprehensive protection under the First Amendment.

253. The First Amendment's Free Speech Clause prohibits government censorship of expression.

254. The First Amendment rights of free speech and expression extend to the campuses of state universities.

255. The sidewalks and open spaces of the University campus are designated public fora—if not traditional public fora—for speech and expressive activities by students enrolled at the University.

256. A public university's ability to restrict speech—particularly student speech—in a public forum is limited.

257. The First Amendment's Free Speech Clause, incorporated and made applicable to the states by the Fourteenth Amendment to the United States Constitution, prohibits content and viewpoint discrimination in the public fora for student speech and expression on the campus of a public university.

258. The First Amendment's prohibition against content and viewpoint discrimination requires Defendants to provide adequate safeguards to protect against the improper exclusion or restriction of student speech based on its content or viewpoint.

259. The Free Speech Clause of the First Amendment protects speech that is provocative, challenging, or offensive.

260. The First Amendment prohibits the government from restricting speech because it might offend, disturb, or discomfort the sensibilities of listeners or because listeners find it offensive, disturbing or discomforting. Any governmental attempts to do so are inherently content and/or viewpoint based, regardless of the government's motives for such restrictions.

261. Under the First Amendment's Free Speech Clause, a prior restraint on citizens' expression is presumptively unconstitutional, unless it (1) does not delegate

35

overly broad licensing discretion to a government official, (2) contains only content and viewpoint neutral reasonable time, place, and manner restrictions, (3) is narrowly tailored to serve a significant governmental interest, and (4) leaves open ample alternative means for communication.

262. Thus, the government may not regulate speech based on policies that permit arbitrary, discriminatory, or overzealous enforcement.

263. Unbridled discretion to discriminate against speech based on its content or viewpoint violates the First Amendment regardless of whether that discretion has ever been unconstitutionally applied in practice.

264. In addition, any content- or viewpoint-based prior restraint must include a requirement that government officials decide whether or not to grant a permit within a specified, brief time period and must include an avenue to appeal an adverse decision.

265. The government may not regulate speech based on overbroad policies that encompass a substantial amount of constitutionally protected speech.

266. The government also may not regulate speech based on policies that are vague.

267. The First Amendment's Free Speech Clause also guarantees a citizen the right to express his views anonymously.

268. While a public university may require a student to identify himself to certain university officials, the First Amendment prohibits the university from requiring the student to identify himself to the entire campus community in order to speak on campus.

269. The First Amendment's Free Speech Clause also guarantees a citizen the right to express his views spontaneously.

270. Defendants' speech codes (*i.e.*, the challenged provisions of their *Policy for Campus Displays* and *Right of Expression of Students Policy*, the related provisions of the *Code of Student Conduct*, and the related practices) run afoul of these clearly

established constitutional principles in a number of ways, causing them to violate the First Amendment facially and as-applied.

271. First, Defendants' speech codes require officials to evaluate the content and viewpoint of expression, including exhibits, students desire to engage in on campus.

272. Defendants' speech codes require students to inform University officials of the appearance, message, and purpose of any exhibit they desire to conduct.

273. Defendants' speech codes then instruct University officials to review whether the appearance, message, and purpose of this exhibit to assess, among other things, its "appropriateness."

274. Defendants' speech codes create a heckler's veto, allowing any student or administrator to silence a speaker and expose him to discipline for engaging in "disorderly conduct" simply by complaining that the speaker's expression causes "alarm, annoyance, or nuisance."

275. Defendants' speech codes are inherently content- and viewpoint-based because they prohibit students from engaging in any expression that creates complaints.

276. Defendants engaged in content and viewpoint discrimination when they applied their speech codes to require Plaintiffs to place warning signs around campus due to the possible reactions people might have to the Cemetery of the Innocents display despite allowing other organizations to communicate their different views on potentially emotionally charged issues freely and without interference.

277. Defendants engaged in content and viewpoint discrimination when they applied their speech codes to require Plaintiffs to place warning signs around campus to protect potential viewers of the Cemetery of the Innocents display from the emotions the display might provoke.

278. Second, Defendants' speech codes confer unbridled discretion upon University officials to discriminate against student speech based on its content or viewpoint.

279. Defendants' speech codes confer unbridled discretion upon University

37

officials when deciding whether to approve or reject requests from students and student organizations to conduct exhibits on campus.

280. Defendants' speech codes confer unbridled discretion upon University officials to impose restrictions upon students and student organizations who desire to conduct exhibits on campus as a condition for allowing the exhibit to occur.

281. Defendants' speech codes provide no guidelines or standards to limit the discretion of University officials in granting, denying, restricting, or imposing conditions upon requests by students to hold exhibits on campus.

282. Defendants' speech codes require students to seek a permit for proposed exhibits from Defendants and then delegate authority to Defendants to determine whether and under what conditions student may hold these exhibits, thus giving Defendants unbridled discretionary power to limit student speech in advance of such expression on campus and to do so based on the content and viewpoint of the speech.

283. Defendants' speech codes confer unbridled discretion upon University officials to manipulate the content or shut down student exhibits because they require students to agree that University officials may "edit, reject, or remove [their] display" in order to conduct an exhibit on campus.

284. Defendants' speech codes confer unbridled discretion upon University officials to determine when an individual exhibit fails to protect the "privacy of individuals" and to impose *ad hoc* requirements on specific students and student organizations to satisfy this indeterminate standard.

285. Defendants' speech codes confer unbridled discretion upon University officials to determine when expression fails to protect the rights of non-participants and to impose *ad hoc* requirements on specific students and student organizations to satisfy this indeterminate standard.

286. Defendants' speech codes confer unbridled discretion upon University officials to determine whether a specific exhibit is "appropriate" for the University

38

community and to deny requests to conduct exhibits that they, based on their subjective assessment or whim, deem to be inappropriate.

287. Defendants' speech codes confer unbridled discretion upon University officials to determine when student expression causes "alarm, annoyance, or nuisance" and thus constitutes "disorderly conduct."

288. Defendants' speech codes provide no guidelines or standard to limit the discretion of University officials in determining when student expression causes "alarm, annoyance, or nuisance" and thus constitutes "disorderly conduct."

289. These grants of unbridled discretion to University officials violate the First Amendment because they create a system in which speech is reviewed without any standards, thus giving students no way to prove that a denial, restriction, or condition upon their speech was based on unconstitutional considerations.

290. Because Defendants have failed to establish neutral criteria governing the granting, denial, or restriction of students' applications to conduct exhibits on campus, there is a substantial risk that University officials will engage in content and viewpoint discrimination when addressing those applications.

291. Defendants exercised the unbridled discretion granted them under their speech codes when they required Plaintiffs to place a sign next to the Cemetery of the Innocents display identifying Students for Life at MUOH as the sponsoring organization.

292. Defendants exercised the unbridled discretion granted them under their speech codes when they required Plaintiffs to place warning signs around campus in order to conduct the Cemetery of the Innocents display.

293. Defendants exercised the unbridled discretion granted them under their speech codes when they required Plaintiffs to place warning signs around campus due to the possible reactions people might have to the Cemetery of the Innocents display.

39

294. Third, Defendants' speech codes, which require students to obtain a permit from University officials in order to hold any exhibit on campus, are unconstitutional prior restraints on speech in areas of campus that are traditional or designated public fora for University students.

295. Defendants' speech codes, which require students to seek a permit for any exhibits they wish to conduct on campus from University officials seven (or ten) business days in advance, are unconstitutional "time, place, and manner" restrictions that violate Plaintiffs' and other students' right to freedom of speech and expression because they are not content-neutral, they are not narrowly tailored to serve a significant government interest, and they do not leave open ample alternative channels of communication.

296. Defendants' speech codes do not contain any brief or definite time period in which University officials must grant or deny students' requests to hold exhibits on campus.

297. Defendants' speech codes are neither reasonable nor valid time, place, and manner restrictions because they are not content-neutral, they are not narrowly tailored to serve a significant government interest, and they do not leave open ample alternative channels of communication.

298. Fourth, Defendants' speech codes prohibit students from conducting an exhibit spontaneously on campus.

299. Instead, Defendants' speech codes require students to seek a permit for any exhibit they desire to conduct and to do so seven (or ten) business days before that exhibit is scheduled to begin.

300. Fifth, Defendants' speech codes are unconstitutionally vague and overbroad.

301. Defendants' speech codes are overbroad because they prohibit a substantial amount of constitutionally protected speech in that they prohibit students from conducting any exhibits in the public fora of campus without a permit from University

40

officials, they require students to seek a permit from University officials seven (or ten) days in advance, and they require students to agree to let University officials manipulate or shut down their exhibit as a condition for receiving the permit.

302. The overbreadth of Defendants' speech codes chills the speech of Plaintiffs and students not before the Court who seek to engage in protected expression in the open, outdoor areas of campus or who seek to engage in expression on campus that some might find offensive, annoying, or alarming.

303. Defendants' speech codes are overbroad because they prohibit a substantial amount of constitutionally protected speech in that they declare that any expression that causes "alarm, annoyance, or nuisance" constitutes "disorderly conduct" and subject students to discipline for engaging in such expression.

304. Defendants' speech codes unconstitutionally censor all private speech that causes "alarm, annoyance, or nuisance."

305. Sixth, Defendants' speech codes unconstitutionally prohibit students from exercising their First Amendment right to speak anonymously.

306. Defendants' speech codes require students to waive their right to speak anonymously through an exhibit in order to obtain a permit to conduct the exhibit on campus.

307. Defendants violated Plaintiffs' right to speak anonymously when the forced Plaintiffs to place a sign next to the Cemetery of the Innocents display recognizing Students for Life at MUOH as the sponsoring entity.

308. Defendants' speech codes do not satisfy strict scrutiny because they support no compelling government interest and they are not narrowly tailored to meet any such concerns.

309. Defendants' speech codes violate Plaintiffs' right to free speech as guaranteed by the First Amendment to the United States Constitution.

310. Because of Defendants' actions, Plaintiffs have suffered, and continue to

41

suffer, irreparable harm. They are entitled to an award of nominal and compensatory damages and equitable relief.

311. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to a declaration that Defendants violated their freedom of speech and an injunction against Defendants' policies and actions. Additionally, Plaintiffs are entitled to nominal and compensatory damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

SECOND CAUSE OF ACTION
**Violation of Plaintiffs' First Amendment Right to Freedom of Speech
Compelled Speech
(42 U.S.C. § 1983)**

312. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1–250 of this Complaint, as if set forth fully herein.

313. The First Amendment's Free Speech Clause prohibits the government from compelling citizens to express or support a message not of their own choosing.

314. The First Amendment's Free Speech Clause, incorporated and made applicable to the states by the Fourteenth Amendment to the United States Constitution, prohibits public universities from compelling students to express messages not of their own choosing.

315. Defendants used the unbridled discretion given them by their speech codes (*i.e.*, the challenged provisions of their *Policy for Campus Displays* and *Right of Expression of Students Policy*, the related provisions of the *Code of Student Conduct*, and the related practices) to require Plaintiffs to place warning signs around their exhibit.

316. Defendants required that Plaintiffs place these warning signs around their exhibit due to the content and viewpoint of Plaintiffs' expression, including the possible reactions of those who would view the exhibit.

317. By requiring Plaintiffs to place these warning signs around their exhibit,

42

Defendants compelled Plaintiffs to convey a message to the University community that Plaintiffs did not voluntarily choose to convey and that undermined Plaintiffs' ability to convey their desired message to passersby.

318. Defendants' infringements of Plaintiffs' First Amendment rights do not satisfy strict scrutiny because they support no compelling governmental interest and they are not narrowly tailored to meet any such concerns.

319. Because of Defendants' actions, Plaintiffs have suffered, and continue to suffer, irreparable harm. They are entitled to an award of nominal and compensatory damages and equitable relief.

320. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to a declaration that Defendants violated their freedom of speech and an injunction against Defendants' policies and actions. Additionally, Plaintiffs are entitled to nominal and compensatory damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

### THIRD CAUSE OF ACTION
### Violation of Plaintiffs' Right to be Free from Unconstitutional Conditions
### (42 U.S.C. § 1983)

321. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1–250 of this Complaint, as if set forth fully herein.

322. The United States Constitution prohibits the government from placing a condition on the receipt of a benefit that infringes upon the recipient's constitutional rights, even if the government has no obligation to provide that benefit in the first place.

323. The United States Constitution also prohibits the government from conditioning the exercise of certain constitutional rights on a citizen's agreement to surrender other constitutional rights.

324. Defendants' speech codes (*i.e.*, the challenged provisions of their *Policy for Campus Displays* and *Right of Expression of Students Policy*, the related provisions of the *Code of Student Conduct*, and the related practices) impose a variety of

unconstitutional conditions upon both students' right to speak freely in the public fora on campus and on the receipt of state benefits (*i.e.*, access to the public fora on campus).

325. Defendants' speech codes require students to agree that University officials may "edit, reject, or remove [their] display" in order to conduct an exhibit on campus.

326. Defendants' speech codes require students to waive their right to speak anonymously through an exhibit in order to obtain a permit to conduct the exhibit on campus.

327. Defendants enforced their speech codes to require Plaintiffs to place an attribution sign next to their exhibit in order to conduct their exhibit, thus conditioning the receipt of state benefits (*i.e.*, access to the public fora of the University's campus) and the exercise of Plaintiffs' constitutional rights (*i.e.*, the right to speak in the public fora on campus) on Plaintiffs surrendering, suspending, or limiting their constitutional right of free speech (specifically, the right to speak anonymously).

328. Defendants enforced their speech codes to require Plaintiffs to place unwanted warning signs around campus in order for Plaintiffs to conduct their exhibit, thus conditioning the receipt of state benefits (*i.e.*, access to the public fora of the University's campus) and the exercise of Plaintiff's constitutional rights (*i.e.*, the right to speak in the public fora on campus) on Plaintiffs surrendering, suspending, or limiting their constitutional right of free speech (specifically, the right to be free from compelled speech).

329. Because of Defendants' actions, Plaintiffs have suffered, and continue to suffer, irreparable harm. They are entitled to an award of nominal and compensatory damages and equitable relief.

330. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to a declaration that Defendants violated their freedom of speech and an injunction against Defendants' policies and actions. Additionally, Plaintiffs are entitled to nominal and compensatory damages in an amount to be determined by the evidence and this Court

44

and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

**FOURTH CAUSE OF ACTION**
**Violation of Plaintiffs' Fourteenth Amendment Right to**
**Due Process of Law**
**(42 U.S.C. § 1983)**

331. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1–250 of this Complaint, as if set forth fully herein.

332. The Fourteenth Amendment to the United States Constitution guarantees Plaintiffs the right to due process of law and prohibits Defendants from promulgating and employing vague and overbroad standards that allow for viewpoint discrimination in Defendants' handling of Plaintiffs' request to conduct an exhibit on campus.

333. The government may not regulate speech based on policies that permit arbitrary, discriminatory, and overzealous enforcement.

334. The government may not regulate speech based on policies that cause persons of common intelligence to guess at their meaning and differ as to their application.

335. The government also may not regulate speech in ways that do not provide persons of common intelligence fair warning as to what speech is permitted and what speech is prohibited.

336. Defendants' speech codes (*i.e.*, the challenged provisions of their *Policy for Campus Displays* and *Right of Expression of Students Policy*, the related provisions of the *Code of Student Conduct*, and the related practices) associated practices contain no criteria to guide University officials when deciding whether to grant, deny, restrict, or impose conditions upon student speech (including requests to conduct exhibits) on campus.

337. Defendants' speech codes contain no criteria to limit the discretion of University officials when deciding whether and how to manipulate the content of a student exhibit or to shut it down because these policies empower them to "edit, reject, or remove [a] display."

338. Defendants' speech codes contain no criteria to limit the discretion of University officials when determining when an individual exhibit fails to protect the "privacy of individuals," whether to impose *ad hoc* requirements on specific students and student organizations to satisfy this indeterminate standard, and what *ad hoc* requirements to impose.

339. Defendants' speech codes contain no criteria to limit the discretion of University officials when determining whether expression fails to protect the rights of non-participants, whether to impose *ad hoc* requirements on specific students and student organizations to satisfy this indeterminate standard, and what *ad hoc* requirements to impose.

340. Defendants' speech codes contain no criteria to limit the discretion of University officials when determining whether a specific exhibit is "appropriate" for the University community and whether to deny requests to conduct exhibits that they, based on their subjective assessment or whim, deem to be inappropriate.

341. Defendants' speech codes provide no criteria to limit the discretion of University officials when determining whether a student's expression has caused "alarm, annoyance, or nuisance," thus constituting "disorderly conduct."

342. Defendants speech codes are impermissibly vague and ambiguous. Thus, they are incapable of providing meaningful guidance to Defendants, and they force students to guess as to whether expression that the First Amendment protects is in fact allowed on campus.

343. The lack of criteria, factors, or standards in Defendants' speech codes renders these policies and practices unconstitutionally vague and in violation of Plaintiffs' right to due process of law under the Fourteenth Amendment.

344. Because of Defendants' actions, Plaintiffs have suffered, and continue to suffer, irreparable harm. They are entitled to an award of nominal and compensatory damages and equitable relief.

345. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to a declaration that Defendants violated their Fourteenth Amendment right to due process of law and an injunction against Defendants' policies and actions. Additionally, Plaintiffs are entitled to nominal and compensatory damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

**FIFTH CAUSE OF ACTION**
**Violation of Plaintiffs' Fourteenth Amendment Right to**
**Equal Protection of the Law**
**(42 U.S.C. § 1983)**

346. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1–250 of this Complaint, as if set forth fully herein.

347. The Fourteenth Amendment to the United States Constitution guarantees Plaintiffs the equal protection of the laws, which prohibits Defendants from treating Plaintiffs differently than similarly situated students.

348. The government may not treat someone disparately as compared to similarly situated persons when such disparate treatment burdens a fundamental right, targets a suspect class, or has no rational basis.

349. Plaintiffs are similarly situated to other students at the University.

350. Defendants have allowed students to engage in various expressive activities (including exhibits) without requiring them to place warning signs around campus, but they imposed this warning sign requirement on Plaintiffs.

351. Defendants have allowed students to engage in various expressive activities (including exhibits) that could spark "emotional trauma," and they allowed these student to engage in these activities without requiring them to place warning signs around campus. But they imposed this warning sign requirement on Plaintiffs.

352. Defendants applied their speech codes (*i.e.*, their *Policy for Campus Displays*, the related provisions of the University's *Right of Expression of Students Policy*, and

47

related practices) to require Plaintiffs to place warning signs around campus due to the possible reactions people might have to the Cemetery of the Innocents display despite allowing other organizations to communicate their different views on potentially emotionally charged issues freely and without interference.

353. When government regulations, like Defendants' speech codes, infringe on fundamental rights, discriminatory intent is presumed.

354. Defendants' speech codes have also been applied to discriminate intentionally against Plaintiffs' rights to freedom of speech, right to be free from compelled speech, and right to be free from unconstitutional conditions.

355. Defendants' speech codes are underinclusive, prohibiting some speech while leaving other speech equally harmful to the University's asserted interests unprohibited.

356. Defendants lack a rational or compelling state interest for such disparate treatment of Plaintiffs.

357. Defendants' speech codes are not narrowly tailored as applied to Plaintiffs because Plaintiffs' speech does not implicate any of the legitimate interests Defendants might have.

358. Defendants applied their speech codes to Plaintiffs in a discriminatory and unequal manner, allowing other students to speak freely without warning signs when Defendants say that Plaintiffs cannot do the same, in violation of Plaintiffs' right to equal protection of the laws under the Fourteenth Amendment.

359. Because of Defendants' actions, Plaintiffs have suffered, and continue to suffer, irreparable harm. They are entitled to an award of nominal and compensatory damages and equitable relief.

360. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to a declaration that Defendants violated their Fourteenth Amendment right to equal protection of the law and an injunction against Defendants' policies and actions. Additionally, Plaintiffs are entitled to nominal and compensatory damages in an amount to be

determined by the evidence and this Court and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendants and provide Plaintiffs with the following relief:

A. A declaratory judgment that Defendants' speech codes (*i.e.*, the challenged provisions of their *Policy for Campus Displays* and *Right of Expression of Students Policy*, the related provisions of the *Code of Student Conduct*, and the related practices) violate Plaintiffs' rights under the First and Fourteenth Amendments, facially and as-applied;

B. A declaratory judgment that Defendants' speech codes violate Plaintiffs' rights under the First and Fourteenth Amendments, facially and as-applied;

C. A declaratory judgment that the Defendants' requirement that Plaintiffs erect attribution signs around their exhibits violated their rights under the First and Fourteenth Amendments;

D. A declaratory judgment that the Defendants' requirement that Plaintiffs erect warning signs around their exhibits violated their rights under the First and Fourteenth Amendments;

E. A preliminary and permanent injunction prohibiting the Defendants, their agents, officials, servants, employees, and any other persons acting in their behalf from enforcing Defendants' speech codes and associated practices challenged in this Complaint;

F. Nominal and compensatory damages for the violation of Plaintiffs' First and Fourteenth Amendment rights from the Defendants sued in their individual capacities;

G. Plaintiffs' reasonable attorneys' fees, costs, and other costs and disbursements

49

in this action pursuant to 42 U.S.C. § 1988; and

H. All other further relief to which Plaintiffs may be entitled.


Respectfully submitted this 29th day of November, 2017.

*/s/ Travis C. Barham*

DAVID A. CORTMAN*
Georgia Bar No. 188810
TRAVIS C. BARHAM*
Arizona Bar No. 024867
Georgia Bar No. 753251
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE,
Suite D-1100
Lawrenceville, Georgia 30043
Telephone:  (770) 339–0774
Facsimile:  (770) 339–6744
dcortman@ADFlegal.org
tbarham@ADFlegal.org

\* Applications for admission *pro hac vice* to be
filed shortly.

THOMAS W. KIDD, JR.
KIDD & URLING, LLC
8913 Cincinnati-Dayton Road
West Chester, Ohio 45069
Telephone:  (513) 733–3080
Facsimile:  (513) 577–7393
tkidd@kiddurlinglaw.com

M. CASEY MATTOX*
Virginia Bar No. 47148
ALLIANCE DEFENDING FREEDOM
440 1st Street, NW, Ste. 600
Washington, D.C. 20001
Telephone:  (202) 393–8690
Facsimile:  (202) 347–3622
cmattox@ADFlegal.org

*Attorneys for Plaintiffs*


### DEMAND FOR TRIAL BY JURY

Plaintiffs demand trial by jury for all matters so triable herein.

*/s/ Travis C. Barham*

TRAVIS C. BARHAM
*Attorney for Plaintiffs*


50

## DECLARATION UNDER PENALTY OF PERJURY

I, ELLEN WITTMAN, a citizen of the United States and a resident of the State of Ohio, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing, that the foregoing is true and correct to the best of my knowledge (except as to statements made on information and belief, and those I believe to be true and correct), and that the foregoing statements that pertain to me are based on my personal knowledge.

Executed this 28 day of November, 2017, at Hamilton, Ohio.

_Ellen Wittman_
ELLEN WITTMAN
President
Students for Life at Miami University of
Ohio, Hamilton

## DECLARATION UNDER PENALTY OF PERJURY

I, ELLEN WITTMAN, a citizen of the United States and a resident of the State of Ohio, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing, that the foregoing is true and correct to the best of my knowledge (except as to statements made on information and belief, and those I believe to be true and correct), and that the foregoing statements that pertain to me are based on my personal knowledge.

Executed this 28 day of November, 2017, at Hamilton, Ohio.

_Ellen Wittman_

ELLEN WITTMAN

52

### DECLARATION UNDER PENALTY OF PERJURY

I, MARGARET BRUNS, a citizen of the United States and a resident of the State of Indiana, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing, that the foregoing is true and correct to the best of my knowledge (except as to statements made on information and belief, and those I believe to be true and correct), and that the foregoing statements that pertain to me are based on my personal knowledge.

Executed this 28 day of November, 2017, at Hamilton, Ohio.

_____
MARGARET BRUNS

53

### DECLARATION UNDER PENALTY OF PERJURY

I, MORGAN SMITH, a citizen of the United States and a resident of the State of Ohio, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing, that the foregoing is true and correct to the best of my knowledge (except as to statements made on information and belief, and those I believe to be true and correct), and that the foregoing statements that pertain to me are based on my personal knowledge.

Executed this 28 day of November, 2017, at Brookville, Indiana.

*Morgan Smith*

MORGAN SMITH

54

## DECLARATION UNDER PENALTY OF PERJURY

I, CHLOE OLBERDING, a citizen of the United States and a resident of the State of Ohio, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing, that the foregoing is true and correct to the best of my knowledge (except as to statements made on information and belief, and those I believe to be true and correct), and that the foregoing statements that pertain to me are based on my personal knowledge.

Executed this 28th day of November, 2017, at Hamilton, Ohio.

CHLOE OLBERDING